UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X

ASDRUBAL MARIANO PICHARDO,


                    *Plaintiff*,
                                                **MEMORANDUM AND ORDER**
        -against-                               21-CV-2711 (KAM)


COMMISSIONER OF SOCIAL SECURITY,

                    *Defendant*.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

Plaintiff Asdrubal Mariano Pichardo ("Plaintiff") appeals the final decision of the Commissioner of Social Security (the "Commissioner"), finding him not disabled from January 31, 2014, through March 31, 2016, and thus not entitled to disability insurance benefits under Title II of the Social Security Act (the "Act"). Plaintiff and the Commissioner have cross moved for judgment on the pleadings. For the reasons herein, Plaintiff's motion is **GRANTED**, the Commissioner's motion is **DENIED**, and the case is **REMANDED** for further proceedings consistent with this Memorandum and Order.

1

## BACKGROUND

The parties have filed a joint stipulation of relevant facts, which the court has reviewed and incorporates by reference. (*See generally* ECF No. 15-2, Joint Stipulation of Facts ("Stip.").)

### I. Procedural History

On July 9, 2014, Plaintiff filed an initial claim for disability insurance benefits ("DIB") based on a variety of allegedly disabling injuries and conditions, including: back injuries, rheumatoid arthritis, diabetes, depression, hip injuries, cervical spine injuries, sciatica, obesity, reflex sympathetic dystrophy, and psoriasis. (ECF Nos. 18—18-2, together, Administrative Transcript ("Tr."), at 128.) Plaintiff's claim was denied by the Social Security Administration ("SSA") on December 3, 2014, and he requested a hearing before an ALJ on February 3, 2015. (Tr. at 128-37, 198-99.)

On February 23, 2017, Plaintiff appeared before ALJ Alan B. Berkowitz, (Tr. at 103-27), who denied Plaintiff's claim in a written decision dated April 20, 2017. (Tr. at 138-55.) Plaintiff requested Appeals Council review of the decision on May 9, 2017. (Tr. at 249.) On February 7, 2018, the Appeals Council vacated ALJ Berkowitz's decision and remanded the claim for another hearing. (*Id.* at 158-60.) The Appeals Council instructed ALJ Berkowitz to remediate procedural errors, gather additional

evidence, and evaluate Plaintiff's mental impairments in accordance with 20 C.F.R. § 404.1520a. (*Id.*)

On remand, ALJ Berkowitz held a supplemental hearing on June 18, 2019, before denying Plaintiff's claim for a second time in a written decision dated July 16, 2019. (Tr. at 72-102, 162-84.) Plaintiff sought Appeals Council review for a second time on July 29, 2019. (*Id.* at 338-40.) On July 7, 2020, the Appeals Council vacated ALJ Berkowitz's second decision, and remanded to a new ALJ for another hearing. (*Id.* at 187-88.) The Appeals Council instructed the newly assigned ALJ to resolve issues between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT") and to further consider a treating physician's opinion, developing the record additionally as needed. (*Id.*)

Following the Appeals Council's decision to remand, on December 9, 2020, Plaintiff appeared for a third hearing on his claim, this time before ALJ Brian J. Crawley (the "ALJ"). (*Id.* at 37-69.) In a written decision dated December 23, 2020, the ALJ found Plaintiff not disabled. (*Id.* at 9-36.) Plaintiff requested review by the Appeals Council, which denied his request on March 24, 2021. (*Id.* at 1-6, 405-08.) This action followed. (*See generally* ECF No. 1, Complaint.)

**II. Hearing before the ALJ**

3

Plaintiff was represented by licensed hearing representative Francisco Serrano at his most recent December 9, 2020, hearing before the ALJ.  (Tr. at 39.)

For context, the Court will briefly examine the events leading up to Plaintiff's initial application for disability.  Plaintiff was initially injured in an automobile accident in 2009 that left him with disc herniations, an annular tear, and injury to his right knee.  (*Id.* at 595-97.)  This injury was exacerbated by a subsequent slip-and-fall accident at work on January 31, 2014, which aggravated Plaintiff's impairments.  (*Id.* at 42, 1241-44.) Plaintiff was 38 years old at the time of the 2014 work accident. (*Id.* at 27.)  As part of his disability claim, Plaintiff was referred for an orthopedic examination, which took place on October 27, 2014.  (*Id.* at 723.)  Plaintiff complained of the following:

> The claimant states he has had diabetes. . . . Due to it he has blurry vision of the right eye and states it contributes to numbness and tingling in his leg . . . He has psoriasis since 2004. Due to it he gets dry patches and itchiness of the skin on his legs. . . . He has neck to lower back pain since 2009 after a car accident. It is a constant sharp throbbing; radiates into the right leg.  It is a 6/10. He was diagnosed with annular tears, Schmorl's nodes, herniated discs and arthritis. . . .
> He has right arm pain since 2002 after a work related injury. He had a laceration of the right hand requiring surgery. Due to it he now has hand and wrist pain which is constant and varies in nature. . . .
> He has right knee pain since 2000 and it comes [and] goes. He was diagnosed with arthritis. It feels unstable and he had physical therapy for it.

(*Id.*)  Plaintiff also sought a referral to and began receiving care from a clinical psychologist in January 2015 based on "concerns about his emotional status and daily functioning, as [Plaintiff] feels anxious and depressed." (*Id.* at 932.)

At the hearing before the ALJ in 2020, Plaintiff described his daily routine after his accident in January 2014 and prior to March 31, 2016, his date last insured.  (*Id.* at 44, 49-50.) Plaintiff stated that at the time, he generally stayed at home, occasionally leaving to go to doctor's appointments or assist with grocery shopping.  (*Id.* at 49-50.)  Plaintiff denied assisting with other household chores, and stated that he could probably sit or stand for about 20 or 30 minutes at a time.  (*Id.* at 51.) Plaintiff also testified that he could probably walk two blocks before needing to rest, and could lift one gallon of milk, but not two. (*Id.* at 51, 55.)  Plaintiff denied having hobbies, explaining that fixing cars had been what he loved to do, but he could no longer do it.  (*Id.* at 53.)  Plaintiff also explained the various medications that he takes, including Lisinopril for blood pressure, Simvastin/Humira for cholesterol, Methotrexate and Plaquenil for lupus lesions, and Hydroxyzine for hives.  (*Id.* at 60.)  Plaintiff also described using heating pads and ice for his hip, shoulder, and neck pain, along with a cane that he was prescribed by a doctor to help him walk.  (*Id.* at 60-61.)

The ALJ called a vocational expert ("VE") as a witness at the hearing, as well. (*Id.* at 65.)  Plaintiff had testified that his past work had been primarily as a car salesman at various establishments, and the VE classified Plaintiff's past work as "salesperson, automobiles" and "manager, vehicles leasing and retail" based on Plaintiff's descriptions. (*Id.*)

The ALJ subsequently asked the VE to consider a person of the plaintiff's age, education, and work history, who could perform sedentary work, but who could "frequently use the right upper extremity for reaching, including reaching overhead, and for handling, fingering, and feeling." (*Id.* at 65-66.)  The VE testified that such a person could perform the jobs of addresser, stuffer, and polisher (eyeglass frames), and that those jobs existed in varying numbers in the economy. (*Id.*)  Upon clarification by the ALJ that the hypothetical individual was limited to performing jobs with "simple, routine, repetitive tasks, and low stress defined as frequently making work related judgments and decisions, and frequently dealing with changes in a routine work setting, with frequent interaction with supervisors, coworkers, and the public," the VE confirmed that such a person could still perform the previously mentioned jobs. (*Id.* at 66.)  The ALJ next asked if a person limited to working "54 minutes of each hour" could perform the jobs listed, which the VE confirmed. (*Id.* at 66-67.)  Upon questioning from the ALJ regarding whether

6

an individual limited to "51 minutes of each hour" could perform the jobs listed, though, the VE stated that such a hypothetical person could not. (*Id.* at 67.)  The VE further confirmed that while missing one day of work per month on an unscheduled basis would be acceptable, two days missed per month would preclude the hypothetical individual from the jobs listed. (*Id.*)  Last, in response to the ALJ's question about an individual that could stand and walk for only one hour combined, and sit for approximately five hours, the VE stated that such a limitation would eliminate all work that exists in the national economy. (*Id.* at 67-68.)

## III. **The ALJ's Decision**

Pursuant to the SSA regulations, an ALJ follows a five-step process for evaluating disability claims, which has been summarized as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits h[er] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider h[er] [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)). "The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Id.* To determine the claimant's residual functional capacity ("RFC"), the ALJ must consider the claimant's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

In the instant case, the ALJ denied Plaintiff's application for disability benefits on December 23, 2020. (Tr. at 9.) Following the five-step test set forth in SSA regulations, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of January 31, 2014, through his date last insured of March 31, 2016. (*Id.* at 14.) At step two, the ALJ found that Plaintiff had the following "severe impairments": degenerative disc disease of the cervical and lumbar spines, bilateral knee disorder, right shoulder disorder, degenerative joint disease of the right hip, diabetes mellitus, obesity, depressive disorder, and anxiety disorder. (*Id.* at 15.)

At step three, the ALJ concluded that none of Plaintiff's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P,

8

Appendix 1.  (*Id.* at 16.)  The ALJ considered both Listing 1.02 (regarding Plaintiff's bilateral knee disorder, right shoulder disorder, and degenerative joint disease of the right hip) and Listing 1.04 (regarding Plaintiff's degenerative disc disease of the cervical and lumbar spines) but concluded that Plaintiff did not meet or equal either listing.  (*Id.*)  Specifically, the ALJ found that Plaintiff's impairments were not accompanied by an inability to ambulate effectively or perform fine and gross movements effectively, for Listing 1.02, or evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, for Listing 1.04.  (*Id.* at 16-17.)  The ALJ also considered Plaintiff's diabetes and obesity in the context of the overall record in making his decision.  (*Id.* at 17.)

The ALJ next evaluated whether Plaintiff's mental impairments met Listings 12.04 (regarding affective disorders), or 12.06 (regarding anxiety-related disorders). (Tr. at 17.)  The ALJ found that Plaintiff did not meet any of the "paragraph B" criteria for Listings 12.04 and 12.06.  (*Id.* at 17-18.)  Specifically, the ALJ found that Plaintiff had no more than a moderate limitation to his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt and manage himself.  (*Id.*)  Because the ALJ found that Plaintiff exhibited no "marked" or "extreme" limitations, the ALJ concluded

9

that Plaintiff did not satisfy the paragraph B criteria.  (*Id.* at 18.)

Having found that Plaintiff did not meet Listing 1.02, 1.04, 12.04, or 12.06, the ALJ next assessed Plaintiff's RFC.  (*Id.*) The ALJ found that Plaintiff could perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except Plaintiff could, in an 8-hour day, (1) sit up to 6 hours, (2) stand or walk up to 2 hours, (3) lift and carry up to 5 pounds frequently and 10 pounds occasionally, and (4) frequently use the "right upper extremity for reaching, including reaching overhead, and frequent handling, fingering, and feeling." (*Id.* at 18-19.)  The ALJ also found that Plaintiff could perform "simple, routine, repetitive tasks" in a "low stress position" that involved frequently (1) making work related judgments and decisions, (2) dealing with changes in routine work settings, and (3) interacting with supervisors, coworkers, and the public.  (*Id.*)  Finally, the ALJ found that Plaintiff could perform the aforementioned tasks for "54 minutes of each hour or 90% of the workday."  (*Id.*)

Regarding Plaintiff's physical impairments, the ALJ credited Plaintiff's claim of back, neck, shoulder, and knee impairments caused by a fall at work that exacerbated earlier injuries from a car accident, but found that the available MRI, x-ray, and physical examination findings and other objective medical tests did not support his subjective claims as to the degree of resulting

impairment or the persistence of the pain.  (*Id.* at 19-27.)  For instance, the ALJ noted that records from Plaintiff's treatment showed "no evidence of [Reflex Sympathetic Dystrophy], paresthesia, hyperesthesia, negative impingement in both shoulders, and full range of motion in the bilateral hip and knees." (*Id.* at 21.)  The ALJ noted that another examination by a separate provider noted "positive straight leg raising, decreased range of motion in the lower back, but frequently demonstrated only mild bilateral paralumbar tenderness, no spinal midline tenderness, nontender facet joints, SI joints, and sacral ligaments, improved range of motion in the lumbar spine, no tenderness in the trochanteric bursa or iliotobial bands, no focal motor or sensory deficits, and normal reflexes." (*Id.*)  The ALJ also pointed to Plaintiff's records from Coordinated Health, in which Plaintiff's examining physician "assessed [Plaintiff] to have no work restrictions" circa March 2014.  (*Id.* at 22.)  Ultimately, the ALJ concluded that Plaintiff's course of treatment did not support his allegations of disability, finding that his treatment had been "essentially conservative, consisting of routine office visits, injections, physical therapy, chiropractic treatment, and medication management" with no "surgical intervention" needed. (*Id.* at 24.)

In reaching his RFC conclusion as to Plaintiff's physical abilities, the ALJ evaluated the opinions of the various treating

physicians and considered opinion evidence as to Plaintiff's functional capacities.  (*Id.* at 24-26.)

First, the ALJ accorded "great weight" to the opinion of Dr. Nabil Farakh, who opined that Plaintiff "was able to perform a light duty job, mostly desk activity, and has limited activity of the bilateral lower and upper extremities."  (*Id.* at 24.)  The ALJ noted that Dr. Farakh both had a "longstanding treatment relationship with [Plaintiff]" and also provided an opinion that was "well supported by and consistent with examinations."  (*Id.*)

Second, the ALJ accorded "great weight" to consultative examiner Dr. Pollack's opinion finding mild or moderate restrictions to most of Plaintiff's physical capabilities, while noting that limitations regarding Plaintiff's vision were not supported by testimony or treatment records.  (*Id.*)

Third, the ALJ accorded "little weight" to treating physician Dr. Michael Nimeh's opinion that Plaintiff could, among other things, "sit for 5 hours and stand or walk for less than one hour during an eight-hour workday, that he would have to alternate standing and sitting every 30-45 minutes, that he requires a cane to ambulate, and that he would have 3 or more absences per month." (*Id.* at 25.)  The ALJ found Dr. Nimeh's opinion "by its own terms is applicable only beginning May 17, 2018, [] well after the date last insured" and as such, was "not probative of the claimant's functioning during the period at issue."  (*Id.*)  The ALJ similarly

assigned little weight to a subsequent 2020 opinion by Dr. Nimeh that was applicable "only beginning September 10, 2020." (*Id.*)

Fourth, the ALJ accorded "little weight" to Dr. Giuseppe Guglielmello's opinion as Plaintiff's treating pulmonologist, noting that it was "rendered well after the date last insured and by its own terms is applicable only beginning July 11, 2017, also well after the date last insured." (*Id.* at 26.)

Fifth, the ALJ assigned little weight to a September 2020 opinion by Dr. Nicole Chiapetti, a rheumatologist, for substantially the same reasons as with Dr. Nimeh's opinions regarding the time covered by the opinion. (*Id.*)

Regarding Plaintiff's mental capacity, the ALJ accorded "little weight" to the opinion of Dr. Calev, who found Plaintiff had several "marked" impairments to his ability to function. (*Id.* at 24-25.) The ALJ found that Dr. Calev's opinion was "not supported by mental status examinations, which have been frequently within normal limits." (*Id.* at 25.) The ALJ also assigned little weight to an opinion by Dr. Nimeh from September 2020 that assessed several limitations in Plaintiff's mental capability. (*Id.*) The ALJ noted that although the opinion stated the limitations "existed three to four years prior to the date of the report," Dr. Nimeh did not begin treating Plaintiff until May 2018, and the report was not corroborated by any treatment notes during the period prior to the date last insured. (*Id.*) The ALJ

13

assigned little weight to an opinion by Sarah Cruz, CRNP, finding "marked" limitations in several of Plaintiff's mental capabilities, finding that the opinion was "by its own terms applicable only beginning September 21, 2020, also well after the date last insured." (*Id.* at 26.)

In addition to weighing the credibility of various doctors' opinions, the ALJ also evaluated Plaintiff's credibility. (*Id.* at 23.) The ALJ found that Plaintiff's "reported daily activities are greater than one might expect, given his allegations of physical and mental disability," and continued:

> The claimant reported to consultative examiner Dr. Pollack that he is able to shower and dress himself. He stated that he watched television, reads, and sometimes needs assistance in dressing. (Exhibit 10F). Although claimant reported difficulty attending to his personal needs in his function report, in October 2017, claimant reported to his treating physician that he had no problems with bathing, dressing, or eating, has no problems with light household tasks, no difficulty climbing stairs, does not get short of breath doing certain tasks, has not fallen in the last 6 months, does not use an assistive device to walk, and does not feel unsteady on his feet (Exhibit 26F at 77, 84). He reported to Dr. Calev that he helps with daily chores for the family (Exhibit 16F at 22, 26, 27). He reported that he could drive and that he can prepare microwave meals, but only sometimes cooked (Exhibit 3E). In addition, as noted, the claimant testified that he did not need help showering and could drive an automobile, shop independently for a couple of items, and wash a few dishes.

(*Id.* at 23-24.) Accordingly, the ALJ found Plaintiff's reported activities of daily living to be consistent with the RFC,

notwithstanding Plaintiff's allegations of total physical and mental disability. (*Id.* at 24.)

At step four, the ALJ found that Plaintiff could no longer perform his past work as a car salesperson or vehicle leasing manager, given his RFC for "less than the full range of sedentary work." (*Id.* at 27.) At step five, the ALJ assessed whether "there were jobs that existed in significant numbers in the national economy" considering Plaintiff's RFC, age, educational attainment, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (*Id.* at 28.) Because Plaintiff's RFC was less than the performance requirements for sedentary work under the Medical-Vocational Rules, the ALJ relied on the VE's opinion. (*Id.*) The ALJ accepted the VE's testimony that a person with Plaintiff's exertional and non-exertional limitations could perform the jobs of addresser, stuffer, and eyeglass frame polisher, each of which existed in varying numbers in the national economy. (*Id.*) The ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (*Id.* at 28-29.)

## STANDARD OF REVIEW

To receive disability benefits, a claimant must be "disabled" within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). A claimant qualifies as disabled when she is unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The impairment must be of "such severity" that the claimant is unable to do his previous work or "engage in any other kind of substantial gainful work." *Id.* § 423(d)(2)(A). "The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (alterations in original)).

An unsuccessful claimant for disability benefits under the Act may bring an action in federal court seeking judicial review of the Commissioner's denial of his or her benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the reviewing court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (internal quotation marks omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether the Commissioner's findings were based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* However, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (*per curiam*).

Federal law explicitly authorizes a court, when reviewing decisions of the SSA, to order further proceedings when appropriate. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (internal

17

quotation marks omitted).   Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  *Pratts*, 94 F.3d at 39.  However, if the record before the court provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits.  *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Kane v. Astrue*, 942 F Supp. 2d 301, 314 (E.D.N.Y. 2013).

## DISCUSSION

On appeal, Plaintiff asserts that the ALJ: (1) improperly evaluated the vocational evidence by failing to inquire "about local or regional positions" given the number of positions available in the national economy; (2) failed to follow the treating physician rule[1] in dismissing Dr. Calev's opinion, and erred in failing to credit Dr. Pollack's findings regarding visual restrictions; and (3) failed to properly evaluate Plaintiff's credibility.  (ECF No. 15-1, Plaintiff's Memorandum of Law in Support ("Pl. Mem."), at 7-25.)  The Court finds no error in the ALJ's evaluation of the vocational evidence or Dr. Pollack's medical opinion, but nonetheless finds remand is necessary due to

---

[1] In 2017, new regulations were issued that changed the standard for evaluating medical opinion evidence for claims filed on or after March 27, 2017.  *See* 20 C.F.R. § 404.1520c.  However, because Plaintiff filed his claims on July 9, 2014, the old regulations, including the treating physician rule, still apply.

a failure to develop the record regarding the medical opinion evidence concerning Plaintiff's mental capabilities.

**I.    The ALJ Properly Evaluated the Vocational Evidence**

"[W]ork which exists in the national economy" is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1566(a). "It does not matter whether - (1) [w]ork exists in the immediate area in which [the claimant] live[s]; [a] specific job vacancy exists for [the claimant]; or (3) [the claimant] would be hired if [he or she] applied for work." 20 C.F.R. § 404.1566(a). "Courts have not established a bright line test as to the threshold number of jobs that is considered 'significant' for purposes of the Act." *Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018) (citation omitted). "However, courts have generally held that what constitutes a 'significant' number is fairly minimal," and numbers between 9,000 and 10,000 jobs "have typically been found to be sufficiently 'significant' to meet the Commissioner's burden." *Id.* (internal quotation marks and citations omitted) (collecting cases).

In the instant case, the VE's testimony established that there are, at minimum, 13,400 jobs existing in the national economy that Plaintiff could perform based on the ALJ's RFC. (Tr. at 66.) Specifically, the VE stated that there were, nationwide, 7,000

jobs available as an "addresser," 5,400 jobs available as a "stuffer," and 1,000 jobs available as a "polisher, eyeglass frames." (*Id.*)  This number of jobs is consistent with those found to be "significant" under the Act by other courts examining the same issue, and this Court finds no reason to diverge from that reasoning.  *See Sanchez*, 336 F. Supp. 3d at 177.

Plaintiff argues that "the occupations identified by the VE, and adopted by the ALJ, are below the 8,000 jobs in the national economy which were found to be insufficient in *Wayne*."  (Pl. Mem. at 9 (citing *Wayne M. v. Saul,* No. 20-CV-465, 2021 WL 1399777, at *16 (D. Conn. Apr. 14, 2021).)  However, Plaintiff's reliance on *Wayne M.* is misplaced.  In *Wayne M.*, the district court found that, based on an incomplete hypothetical, the ALJ had actually only identified "one job that accounts for occasional reaching – that of a bakery worker, conveyor line."  *Wayne M.*, 2021 WL 1399777, at *15.  As such, the district court evaluated the number of jobs in the national economy for *only* that one occupation, and ignored the other jobs offered by the VE.  *Id.* at *16.

Here, there is no such reason to look at each of the occupations in isolation, as Plaintiff appears to ask this Court to do, because there is no argument that only one of the occupations presented by the VE properly accounted for the Plaintiff's RFC.  As a result, the Court examines the available jobs in aggregate, as is the practice in other cases examining the

number of jobs available in the national economy. *See Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 231 (N.D.N.Y. 2015) (analyzing the three occupations provided by the VE in aggregate).

Plaintiff also argues that the ALJ "only inquired about alternate work in the national economy, and never inquired about local or regional positions" but cites no authority stating that such an inquiry was necessary. (Pl. Mem. at 10.)  In the absence of any authority to the contrary, and in light of the statutory language, this Court finds that the ALJ did not err in only inquiring as to the number of jobs available nationally. *See* 42 U.S.C. § 423(d)(2)(A) ("'work which exists in the national economy' means work which exists in significant numbers **either** in the region where such individual lives **or** in several regions of the country) (emphasis added).

For the foregoing reasons, the Court finds that the ALJ did not err when he determined that jobs existed in significant numbers in the national economy based on the VE's testimony that there were 13,400 positions available across three different occupations. *See Wayne M.*, 2021 WL 1399777, at *16 ("numbers in the range of 10,000 jobs nationally have typically been found to be sufficiently 'significant' to meet the Commissioner's burden").

## II.  The ALJ Failed to Develop the Record

Before examining the ALJ's evaluation of both the medical opinion evidence and the Plaintiff's credibility, the Court will

first discuss an important predicate – whether the ALJ properly developed the record in the instant case.

"Whether the ALJ has met his duty to develop the record is a threshold question that must be determined before the Court reviews whether the ALJ's final decision is supported by substantial evidence." *Miranda v. Comm'r of Soc. Sec.*, No. 22-cv-4226 (PKC), 2023 WL 6385727, at *6 (E.D.N.Y. Sept. 29, 2023) (internal quotation marks and citation omitted).  Even when not raised by the claimant, the Court "must independently consider the question of whether the ALJ failed to satisfy his duty to develop the Record." *Sanchez v. Saul*, No. 18-cv-12102 (PGG) (DF), 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13, 2020), *report and recommendation adopted sub nom. Sanchez v. Comm'r of Soc. Sec.*, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020).  "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations omitted).  "Legal errors regarding the duty to develop the record warrant remand." *Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 (S.D.N.Y. 2015) (collecting cases).

In the instant case, the weight the ALJ assigned to the Plaintiff's treating psychologist's medical opinion evidence regarding Plaintiff's mental capabilities indicates that the ALJ should have further developed the record.  Although the ALJ

considered the opinion of Dr. Calev, Plaintiff's treating psychologist, the ALJ assigned the opinion "little weight" as it was "not supported by [Dr. Calev's] mental status examinations, which have been frequently within normal limits." (Tr. at 24-25.) Subsequently, in crafting the RFC, the ALJ limited Plaintiff to "simple, routine, repetitive tasks" in a "low stress position." (*Id.* at 19.)  The ALJ reasoned that "[t]he simple, unskilled nature of the jobs described in the residual functional capacity accounts for any issues the claimant may have with concentration due to his pain and issues with depression and anxiety." (*Id.* at 27.) However, the ALJ did not point to any medical opinion evidence, or other expert testimony supporting the mental limitations in the ALJ's RFC.

Plaintiff accurately points out the issue with the ALJ's decision-making process in his reply brief:

> Unlike *Woodmancy v. Colvin*, [577 F.App'x 72 (2nd Cir. 2014),] the ALJ and the Commissioner failed to send Mr. Pichardo for a psychiatric consultative examination, and both of the ALJs who presided over Plaintiff's three (3) hearings chose not to obtain any medical expert testimony at the hearings. (Tr. 37-69, 72-127, 587-1880.) In fact, even at the initial determination stage of this claim, the claim was denied by a Single-Decision Maker ("SDM"), and the State-Agency never had any medical expert – physical or psychiatric – review any of Mr. Pichardo's medical records. (Tr. 128-37.) As a result, Dr. Calev's opinion is completely uncontradicted by any other doctor or psychologist . . . .

(ECF No. 17, Plaintiff's Reply Memorandum of Law in Further Support ("Pl. Reply"), at 2.)  Setting aside the issue of whether the ALJ

improperly assigned little weight to Dr. Calev's opinion, the Court agrees that, once the ALJ had determined he would not rely on the treating psychologist's medical opinion, he was obligated to obtain some other substantial evidence on which to base his RFC. As noted by the Plaintiff, this could have taken the form of a psychiatric consultative examination, or medical expert testimony at the hearing itself.

Because an ALJ is a layperson and not a medical doctor, the ALJ may not interpret raw medical data when determining a social security claimant's RFC. *Figaro v. Comm'r of Soc. Sec.*, No. 1:21-cv-4481 (PKC), 2022 WL 4647102, at *5 (E.D.N.Y. Sept. 30, 2022). As a result, an ALJ who makes an RFC finding without a supporting expert medical opinion "improperly substitute[s] his own opinion for that of a physician" and thus "commit[s] legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010). Indeed, the cases cited in the Commissioner's opposition on this point all generally involve a situation where an ALJ relied upon *other* medical opinion evidence after rejecting a provider's opinion. *See, e.g., Jasen v. Comm'r of Soc. Sec.*, No. 16-CV-6153P, 2017 WL 3722454, at *12 (W.D.N.Y. Aug. 29, 2017) ("Here, the record contained an opinion from another medical professional regarding Jasen's ability to perform the physical requirements of work."); *Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016) ("Taken together, Johnson's testimony and Dr. D'Angelo's letter

constitute 'relevant evidence [that] a reasonable mind might accept as adequate to support' the conclusion that Johnson could perform 'light work.'"); *Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 79 (2d Cir. 2018) ("Dr. Moeckel's assessment provides substantial evidence supporting the ALJ's determination that Trepanier's medical problems did not prevent him from performing the lifting requirements of his past medium exertional job.").

The Court notes that an ALJ's RFC determination may still be valid even when it "does not perfectly correspond with any of the opinions of medical sources cited in his decision." *Trepanier*, 752 F. App'x at 79. Nonetheless, there must be *some* evidence underlying the ALJ's RFC, as to find otherwise would allow the ALJ "to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Medical records and findings alone cannot provide the substantial evidence necessary to make an RFC determination in the absence of medical opinion evidence. *See Pearson v. Comm'r of Soc. Sec.*, No. 20-cv-3030 (AMD), 2021 WL 3373132, at *4 (E.D.N.Y. Aug. 3, 2021). Accordingly, the ALJ erred in failing to develop the record further after rejecting the only medical opinion regarding Plaintiff's mental capabilities. On remand, the ALJ should obtain additional medical evidence to assist in determining Plaintiff's mental RFC.

**III. The ALJ Properly Rejected Vision Limitations**

Dr. Pollack, the consultative examiner who evaluated Plaintiff on October 27, 2014, opined that Plaintiff is "restricted in activities which require fine visual acuity of the right eye," based on a vision examination which showed 20/50 vision in Plaintiff's right eye and 20/25 vision bilaterally without glasses. (Tr. at 724-26.) At the hearing before the ALJ that resulted in the decision at issue in the instant case, however, Plaintiff did not testify regarding any visual restrictions. (*Id.* at 44-64.) In an earlier hearing in February 2017, Plaintiff testified before a different ALJ that he had "blurred vision" in his right eye, but did not need glasses to read or drive. (*Id.* at 117-18.) Plaintiff also indicated in his August 2014 function report that he did not use glasses or wear contact lenses. (*Id.* at 477.) Ultimately, the ALJ did not include Dr. Pollack's vision limitations in the determination of Plaintiff's RFC.

Plaintiff contends that the ALJ erred when he gave little weight to the vision limitations in Dr. Pollack's opinion. (Pl. Mem. at 14.) Plaintiff maintains that the ALJ, who did not make reference to the February 2017 testimony regarding Plaintiff's "blurred vision," "either did not review the entire record by failing to review the prior hearing transcripts, or . . . intentionally ignored that prior testimony." (*Id.*) As a result, Plaintiff argues that the ALJ erred because the vision limitations

26

identified by Dr. Pollack should have been included in Plaintiff's RFC.

The Court finds that the ALJ did not err in analyzing the vision limitations discussed in Dr. Pollack's opinion. First, it was not error, on this record, for the ALJ to conclude that Plaintiff did not have a severe vision impairment. *See* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). More importantly, the ALJ did not err by declining to include any vision limitations in Plaintiff's RFC determination. As the ALJ explained, Plaintiff did not "did not testify to any vocational limitations due to a vision impairment" and the record "does not show any regular treatment for a vision impairment." (*Id.* at 24.) Additionally, though Plaintiff's 2014 function report made reference to "blurry vision" it also stated that he can "see very well" and did not indicate any use of glasses or contact lenses. (*Id.* at 477.) Furthermore, regarding Plaintiff's February 2017 testimony, the Court notes that it is not clear whether the testimony was intended to explore Plaintiff's vision problems as of the date of the hearing in 2017, or prior to Plaintiff's date last insured of March 31, 2016. (*Id.* at 117-18.) In the presence of such ambiguity and a lack of explicit testimony about vision problems during the relevant period in Plaintiff's subsequent hearing in 2020, it was

reasonable for the ALJ to instead rely on evidence expressly bearing on the relevant period.

As such, in reviewing the record as a whole, "[t]his was not a situation where the ALJ needed a contrary medical opinion in order to reject the vision limitations found by Dr. Pollack, a consultative examiner who only examined Plaintiff once." *Cervini v. Saul*, No. 17-CV-2128 (JMA), 2020 WL 2615929, at *8 (E.D.N.Y. May 21, 2020). Accordingly, in the absence of additional evidence to the contrary, the ALJ did not err in rejecting the vision limitation proposed by a consultative examiner.

## IV. Remand to the Same ALJ to Develop the Record is Appropriate

Plaintiff also argues that the ALJ erred in his evaluation of Plaintiff's credibility regarding Plaintiff's statements concerning his symptoms and their impact on his functioning. (Pl. Mem. at 22.) The Court declines to resolve this argument, however, given the ALJ's failure to develop the record is a threshold problem requiring remand, and the ALJ is expected to review his credibility determination in the context of additional medical opinion evidence.

Notwithstanding the above, the Court will address Plaintiff's separate argument that the instant case should be remanded solely for calculation of benefits and should alternatively be heard before a different ALJ. (Pl. Mem. at 20, 25.) The Second Circuit has stated that "where the administrative record contains gaps

28

. . . [and] further findings would so plainly help to assure the proper disposition of the claim, we believe that remand is particularly appropriate." *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) (internal quotation marks and citation omitted). On the other hand, "where [the Second Circuit] has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). Here, there is a reasonable basis to conclude that a more complete record might support the Commissioner's decision and, therefore, remand to further develop the record is appropriate.

The ALJ assigned Dr. Calev's opinion regarding Plaintiff's mental limitations "little weight" because he concluded that the opinion was "not supported by mental status examinations, which have been frequently within normal limits." (Tr. at 24-25.) As noted by the Commissioner, it is entirely proper for an ALJ to compare a medical opinion to the underlying treatment records, as otherwise "any treating source's opinion [would become] self-proving." (ECF No. 16-1, Defendant's Memorandum of Law in Support ("Def. Mem."), at 7); *see also* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is **well-supported by medically acceptable clinical and laboratory diagnostic techniques**

and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.") (emphasis added).

Accordingly, the Court does not find compelling Plaintiff's argument that "the ALJ had no evidentiary basis to dismiss or discount the treating psychologist's assessment," despite the gaps in the record and the ALJ's failure to further develop the record. (Pl. Mem. at 20.)  As noted by the Commissioner, an ALJ may accord a medical opinion little weight based on contradictions with or a lack of support in the record. *Woodmancy v. Colvin*, 577 F. App'x 72, 75 (2d Cir. 2014) (finding the ALJ was acting within her discretion in according opinions "little weight because record evidence of unremarkable clinical findings contradicted or failed to support the limitations conclusions in [the] opinions").  The Court agrees with Plaintiff that the ALJ had an affirmative duty to fill the resulting gap in the record after dismissing the opinion, and as such, remand is warranted.  The Court finds that there is a reasonable "basis to conclude that a more complete record might support the Commissioner's decision" and that remand solely for calculation of benefits is inappropriate. *Rosa*, 168 F.3d at 83.  Instead, given the gaps in the record discussed previously, the case shall be remanded for further proceedings.

Plaintiff also requests that the instant case should be heard by a "different ALJ" in the event it is remanded for further

proceedings. (Pl. Mem. at 25.) Plaintiff makes this request in passing at the end of his motion, and does not offer any arguments beyond a citation to *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292-93 (E.D.N.Y. 2004). As noted in *Sutherland*, courts weigh several factors in considering whether remand to a new ALJ is appropriate, including:

> (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party.

*Id.* at 292. Here, Plaintiff cites no portion of the hearing transcript showing bias or hostility, and does not offer any other evidence showing that the ALJ will not apply the appropriate legal standard on remand. The Court's review of the record reveals no inappropriate comments or considerations in the ALJ's decision or conduct at the hearing warranting remand before a new ALJ. Furthermore, the Court notes that the Appeals Council already remanded the case to be heard before a new ALJ once, and although Plaintiff has already had three hearings, only one was held before the ALJ whose decision is being reviewed in the instant case. (Tr. at 187-88.) Consequently, the Court finds remand to a different ALJ unnecessary in light of the record as a whole.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **GRANTED**, Defendant's cross-motion for judgment on the pleadings is **DENIED**, and the case is **REMANDED** for further proceedings consistent with this Memorandum and Order.

On remand, the ALJ shall:

(1) Further develop the record by seeking additional medical opinion evidence or expert testimony regarding Plaintiff's mental impairments and capabilities, and address any such evidence in assessing the severity of Plaintiff's impairments and, if necessary, in crafting Plaintiff's RFC. The ALJ shall also evaluate the Plaintiff's credibility in light of the newly developed record.

The Clerk of Court is respectfully directed to enter judgment remanding this case, and to close the case.

**SO ORDERED.**

DATED:     January 31, 2024
           Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge